KANSAS INVESTMENT COMPANY *vs.* TIMOTHY H. CARTER
& another.

Suffolk.    December 6, 1893. — January 9, 1894.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Landlord and Tenant — Lease — Breach of Covenant — Unnecessary Removal
of Building — Evidence of Authority and of Action under it.*

If the lessor of a room in a building in a city, upon receiving notice from the inspector of buildings in that city that the building is deemed by him to be unsafe, takes the building down unnecessarily, when he might cause it " to be made safe and secure," as authorized by St. 1885, c. 374, § 111, without taking it down, and without disturbing the possession of the lessee of the room, the latter may maintain an action against him for breach of the covenant for quiet enjoyment in the lease.

In an action by the lessee of a room in a building in a city against the owner, his lessor, for breach of the covenant for quiet enjoyment in the lease, if it appears that, upon receiving notice from the inspector of buildings in that city that the building was deemed by him to be unsafe, a tenant who held the premises under a lease for a long term took the building down unnecessarily, when he might have caused it " to be made safe and secure," as authorized by St. 1885, c. 374, § 111, without taking it down, and without disturbing the possession of the lessee of the room, proof of a written agreement executed by the owner, the tenant, and a builder, whereby the owner consented to the erection of a new building upon the site, gave to the tenant an option to purchase the estate with the finished building thereon, and took a guaranty for the erection of the building, and evidence that the owner made no objection to the tenant's proceedings, although aware of them, are sufficient to show that the owner gave authority to the tenant to remove the building, and that the latter acted under that authority.

CONTRACT, against Timothy H. Carter and Francis A. Dewson, for breach of the covenant for quiet enjoyment in a lease, by which the defendants demised to the plaintiff " the store or office on the first floor of the Carter Building, so called, on Water and Devonshire Streets and Spring Lane, in the city of Boston," for the term of five years from April 1, 1888, and containing the covenant that the lessee " shall peaceably hold and enjoy the said rented premises without hindrance or interruption by the said lessors, or any person or persons whomsoever." Trial in the Superior Court, without a jury, before *Dunbar*, J., who reported the case for the determination of this court, in substance as follows.

It appeared that the lease declared on was duly executed and delivered by the defendants to the plaintiff. At the time of the execution of the lease, the defendant Carter was, and continued to be down to the commencement of this action, the owner of the building in which the premises leased to the plaintiff were situated. The defendant Dewson was, at the date of the plaintiff's lease, a lessee of the entire building from the defendant Carter, but his interest terminated on October 1, 1888.

On August 11, 1888, the defendant Carter leased the entire premises, subject to the plaintiff's lease, to his sons, John Carter, Henry H. Carter, and Thomas W. Carter, for a term of fifteen years from October 1, 1888: and on April 20, 1892, he executed to them, subject to the plaintiff's lease, a further lease of the premises for a term of thirteen years and seven months from October 1, 1903; and on June 29, 1892, he extended the last mentioned lease for a period of fifteen years beyond the term therein granted. On April 25, 1892, John Carter, Henry H. Carter, and Thomas W. Carter executed a lease of the entire premises to Clarence H. Blackall, an architect, for the term of twenty-five years from May 1, 1892, which, on June 29, 1892, was extended for an additional term of fifteen years. On June 1, 1892, Blackall began to tear out the plaster and old finish in the upper stories of the building, with a view to repairing the upper stories and adding an elevator and steam heat, and continued the work until June 21, 1892, on which day he received a notice from the inspector of buildings of the city of Boston, stating that, " after a careful survey and inspection " of the premises in question " by this department, they are deemed to be unsafe and dangerous, in accordance with the provisions of " St. 1885, c. 374, §§ 111, 112. A similar notice was sent on the same date to the defendant Carter. Blackall testified that, upon receiving this notice, with reference to making the building secure, he made a thorough examination of it, and consulted with the builders and the inspector of buildings and his deputies; and further testified that, in his opinion as an expert, the only way to make the building safe and secure was to take it down. On June 27, 1892, the defendant Carter, Blackall, John Carter, Henry H. Carter, and Thomas W. Carter, and Woodbury and Leighton, a firm of build-

ers, entered into a contract in writing, which, with the exception of the signatures, is printed below.* On July 1, 1892, Blackall sent to the plaintiff a notice, which was duly received. stating that, having received notice from the inspector of buildings that the building in question was deemed by him to be unsafe and dangerous, " I hereby notify you that the same will be taken down, and that the work will commence on or before August 1, and you are notified to vacate before that date." On or about the last named date Blackall began to take down the building, and continued this work until the building was entirely removed.

The plaintiff was thus disturbed in the enjoyment of its premises, and dispossessed therefrom, and left them on August 11, 1892, at which time part of the walls had been taken down immediately over its premises, the windows were out, and most of the floors had been removed. On August 5, 1892, the plaintiff sent a notice to the defendant Carter, stating that Blackall,

---

* " The undersigned, owner and lessees and sole controllers of the estate on Water and Devonshire Streets and Spring Lane in the city of Boston, having heretofore secured to Clarence H. Blackall a lease of said estate for twenty-five years from May 1, 1892, with certain agreements therein for the expenditure of at least twenty thousand dollars in improvements thereon, which agreements were guaranteed by Woodbury and Leighton, and since said date it having been found that the contemplated improvements would involve a much larger expense than the parties originally considered; and in view of this the opinion of both lessors and lessee being that it would be better to take down the old building and erect a new one on the same site with an additional story or stories thereon; now said owner and lessors and the lessee, said Blackall, hereby consent and agree that such new building may be erected without affecting the said lease of the estate in any of its terms, except that the same shall be extended by an indorsement thereon for a further period of fifteen years, the said Blackall to have all the old material in the building, and to erect the new building at his own expense, in accordance with the building laws of the city, in a good, substantial, workmanlike manner, and as a further consideration for the erection of such new building, the said Blackall is hereby given an option to purchase said estate with the finished building thereon at any time within five years from the date of his said lease for the sum of three hundred and eighty thousand dollars.

" And the undersigned, Woodbury and Leighton, hereby guarantee the erection of the new building to the owner and lessors of said estate.

" And it is further agreed that no condemnation of the said old building by the city inspector of buildings shall in any way affect the force or validity of the said lease hereby agreed to be extended."

"claiming title under you," was interfering with the quiet occupation by the plaintiff of the premises leased to it, and that it would hold the defendant responsible under his covenants in the lease for any damage to the plaintiff's estate in the premises, or to its occupation or business there carried on.

The building in question was five stories in height, and was used for stores and offices. It was situated in a thickly settled portion of the city of Boston, and was bounded on the north, east, and south by Water Street, Devonshire Street, and Spring Lane, respectively, and on the west side by an adjoining building, between which and the building in question was a cross party wall which projected for a short distance to Water Street. The latter building was sixty feet in height, and extended about one hundred feet on Water Street and Spring Lane, and eighteen feet and nine inches on Devonshire Street. The premises occupied by the plaintiff were on the ground floor on the Devonshire Street end, and occupied the entire width of the building on Devonshire Street, and measured twenty-two feet on Water Street and Spring Lane. About forty feet from Devonshire Street was a cross wall, which ran from Water Street to Spring Lane, parallel with Devonshire Street. The foundations were between twenty and twenty-four inches thick, and consisted of ordinary stone of all sizes laid in mortar. A series of stone posts and iron columns, sixteen inches square, without plinths, rested directly on the foundation, and extended along Water Street and Devonshire Street, and on Spring Lane were three brick piers, five feet wide each, the posts, columns, and piers running up one story. Granite lintels, sixteen inches high and twelve inches thick, rested by their weight and that of the wall above upon the posts and columns, and thus operated as a tie. The external walls on Water Street, Devonshire Street, and Spring Lane, above the first story, were built of brick and mortar, and were twelve inches in thickness. The party wall was eight inches thick, and was built originally of brick, but had disappeared part of the way.

The defendants, in support of their contention that the building was on June 21, 1892, unsafe and dangerous, within the meaning of St. 1885, c. 374, §§ 111, 112, introduced evidence which tended to show that the foundations were insecure; that

two of the external walls were cracked in places, one of them being two and a half inches out of plumb and weakened by horizontal openings cut into it; that the west party wall and the chimneys resting against it had crumbled away in certain places; that parts of the brickwork in the western wall rested on wooden timbers, and portions of this wall which had disappeared had been replaced by a thin screen of galvanized iron; that some of the roof timbers had been more or less burned; that the floor timbers in each story were badly decayed, and in many cases had pulled away from the walls, causing the floors to deflect; that the main girders supporting the floor timbers in each story were of wood, in some parts a single stick, in others several sticks, and supported brickwork beyond their weight; that the wooden columns supporting the girders had been warped and twisted, and their centres were not directly over each other in the different stories; that columns intended to support the stairways had got away, so that they supported nothing; that the floor in the third story underneath a brick smelting furnace had got away entirely under it; that none of the floor beams had the customary iron ties to hold them to the walls; that the mortar used in the brick work was poor in quality; that across the head of the windows the lintels, instead of being brick, were wood, and in many cases badly rotted; and that the iron columns extending around the first story were not tied together laterally, except by the weight resting on them.

The defendant also introduced testimony tending to show that the only practicable remedy for the defects in the building was to take the building down.

John S. Damrell, the inspector of buildings of the city of Boston, called as a witness by the defendants, testified that, at the time of his notice of June 21, he had made no personal examination of the building, but his deputy, one Frye, had done so, and reported to him, and that afterwards he ordered a special examination by Frye and an architect, whose report was made to him on June 21; that afterwards, between June 21 and 25, he was in the building for from ten to twenty minutes, though long enough to satisfy him, having gone by invitation of his deputy to confirm his judgment, but made no extended examination; that it is not unusual for walls to be out of plumb; and that he gave no warn-

ing or notice to the plaintiff or other tenants to remove, it not being his practice to give such notice to the tenants when they acquiesced in the demands of the department.

William S. Frye, one of the assistant inspectors of buildings of the city of Boston, called as a witness by the defendants, testified that he examined the building on June 20, 1892; that he found the floors very much deflected, the walls cracked in various places, and the girder which supported the two ends of the first floor almost entirely gone; that the partitions were in bad order, and some parts of the floor were supported on a partition that would hardly support itself; that the construction was poor to begin with; that, although a two and a half inch over-hang to a wall could not really imperil the wall, he considered that the condition of the floors in connection with the wall would render the wall unsafe; that the fracture in the external portion of the west wall extended for a distance of five to six feet; that the posts supporting girders above the first story, on which the floors rested, were not plumb over one another; and that this was a serious defect, as, in case of lateral pressure, it would make a depression in the floors. On cross-examination, he testified that his examination of the building lasted half an hour; that he did not examine the foundations or the building below the third story, but presumed that he went up through the building, as it was his custom to go around; that all the floors were defective; that, although the law had been altered so as to require supporting columns to be directly over one another, a great many buildings existed where they were not; and that these buildings stood, but that in this case the girder was rotten under the columns. On redirect examination, he testified that the walls could have been ironed together, but that, if they were thickened, heavier columns and a heavier foundation would have been required to support them.

There was also evidence that, during the time of taking down the building, travel was uninterrupted in Spring Lane, Water Street, and Devonshire Street; that the building was full of tenants, some of whom began to leave on the 1st of June and some of whom did not leave until the 1st of July; and that the premises covered by the lease to the plaintiff and occupied by it were in themselves in good order, except that the floor above was

somewhat deflected, and the girder holding the first floor was almost entirely gone.

One Emery, an expert builder, testified, as a witness for the plaintiff, that in his opinion a twelve-inch wall two inches out of plumb, as much as this, was not dangerous; that he examined the building in question on the day when the plaintiff moved out, and afterwards examined the foundations when the walls had been taken down; that in his opinion they were of sufficient strength to hold the building; that he did not consider a building with such cracks in the wall unsafe, and that he considered a building safe as to the floors, even if the floor timbers had rotted away from the walls; that he thought there were stone caps over the windows; that the brickwork over the window caps only had to bear the weight of the floor timbers; that, if the foundations were poor, the columns resting upon them could have been shored up and a new foundation put in; that the external walls could have been widened four inches; that new floors could have been put in; that the girders could have been supported by new columns; that any columns not properly on centres could be replaced or new ones added; that the Spring Lane wall could have been straightened, if out of plumb; that the chimneys could have been rebuilt; that a new roof could have been put on; that, without thickening the walls, they could have been secured by putting rods through the floors and building additional cross-walls, and the walls might be thickened four inches practicably; that such portions of the party wall as had fallen down could have been rebuilt; that the cross-walls could have been repaired; that new beams could have been put in in place of those that had been burned; that any cracks in the walls could have been repaired; and that all these things could have been done without disturbing the plaintiff's business.

It was agreed that the plaintiff had paid its rent, and asked for no suspension or abatement of it.

The plaintiff contended that the act of Blackall in removing the building was authorized by the defendant Carter; and this was denied by the defendants.

Blackall, called as a witness by the defendants, testified that he took down the building by the authority of the inspector of

buildings, and that he did not take the building down by virtue of any authority from the defendant Carter. On cross-examination, he testified that between June 21 and 27 was the time when he changed his mind, and determined to pull down the building; that he talked with the Carters about it, and drew the agreement of June 27; that he did not know whether they knew he was going to tear it down, or had made up his mind to tear it down; that the agreement of June 27 was made in consequence of his talk with them; that in order to put up a new building it was necessary to tear down the old one; and that they made no objection.

Henry H. Carter, a son of the defendant Carter, and his agent for all purposes throughout this transaction, was called as a witness by the defendants, and testified that, after the agreement of June 27, 1892, was signed, the witness and Blackall had no conversation as to the time when Blackall should erect a new building; and that no time was stated, excepting after he had arranged with the tenants who had leases. On cross-examination he testified that, representing his father, he did not remember that he made any objection to or forbid Blackall's taking down the building; that he understood that it was to come down in time, but at no time certain; that when the witness signed this agreement Blackall had the right to take it down within eighteen months; and that that was after he got the notice from the city authorities.

Upon the foregoing evidence, the defendants asked the judge to rule as follows:

" 1. If the court finds that on June 21, 1892, the building in question was unsafe and dangerous, within the meaning of St. 1885, c. 374, §§ 111, 112, the notice sent by the inspector of buildings on that date to Clarence H. Blackall conferred upon him, as lessee of the entire building, the right either to make the building safe and secure, or to remove it, as he might deem best; and his election to remove the building and its removal in pursuance of such election being neither a violation of any duty which he owed the plaintiff, nor an act done in pursuance of any right existing at the execution of the plaintiff's lease, but a lawful act done in pursuance of a new right, affords no ground for imposing any liability upon the defendant Carter in this action,

even if the court should find that the building could have been made safe and secure.

" 2. If the court should find that the building, on June 21, 1892, could have been made safe and secure, and that, by reason of such fact alone, its removal by Blackall was a violation of the plaintiff's rights, the defendant Carter cannot be held liable, in the absence of evidence that the removal was authorized by him, or that Blackall assumed to act by authority from the defendant Carter, and that such assumption of authority was sanctioned by the defendant Carter, and there is no evidence that any such authority was given by the defendant Carter or assumed by Blackall.

" 3. If Blackall removed the building in pursuance of a supposed right to do so in consequence of the notice of June 21, 1892, and not in pursuance of or reliance upon any subsequent authority from the defendant Carter, then, even if such removal was a violation of the plaintiff's rights, it was not a violation caused by the defendant Carter or by his authority, and he is not liable therefor."

The judge declined to give the rulings requested; ruled that there was evidence that the removal was authorized by the defendant Carter; found as a fact that the building was removed by Blackall in pursuance of the authority thus conferred by Carter; found for the plaintiff against the defendant Carter, and assessed damages, which were fixed by agreement in the sum of $1,250; and found for the defendant Dewson.

If the rulings requested, or any of them, should have been given, or if, upon the foregoing evidence, the findings could not be sustained, judgment was to be rendered in favor of both defendants; otherwise, judgment was to be rendered in accordance with the findings.

*W. M. Stockbridge*, for the defendants.

*A. Hemenway*, for the plaintiff.

ALLEN, J.   1.  The defendants asked for a ruling, in substance, that after receiving the notice from the inspector of buildings Blackall had the right either to make the building safe and secure, or to remove it, as he might deem best; and that his election to remove it afforded no ground for imposing any liability upon Carter, the owner, even if the court should find that the

building could have been made safe and secure. This ruling was rightly refused. The St. 1885, c. 374, § 111, required the defendants, upon receiving the notice, to cause the building " to be made safe and secure, or taken down." Doing either would satisfy the requirement of the statute. *Salem* v. *Eastern Railroad*, 98 Mass. 431, 441. *Watuppa Reservoir* v. *Mackenzie*, 132 Mass. 71, 74. The lease to the plaintiff contained an express covenant that the plaintiff " shall peaceably hold and enjoy the said rented premises without hindrance or interruption by the said lessors or any person or persons whomsoever." This covenant bound the lessors not to do any unnecessary thing to disturb the possession of the lessee. If it was necessary to take down the building for reasons of safety, then it might be taken down. But if the building could be made safe and secure without taking it down, and without disturbing the possession of the lessee, then the lessors would violate the lessee's rights by taking it down. The right of election as to the mode of obeying the requirement of the statute, so far as the lessee's rights are concerned, was limited by the covenant in the lease. If the building was taken down without necessity, then the lessors are responsible. See *Taylor* v. *Plymouth*, 8 Met. 462, 465.

2. The defendants asked for a further ruling, in substance, that there was no evidence that any authority was given by the defendant Carter to the defendant Blackall to remove the building, or that Blackall assumed to act by such authority. The written agreement of June 27, 1892, was signed by the defendant Carter as owner of the estate, and also by Blackall, and in express terms Carter as owner thereby consented and agreed that the new building might be erected, and gave to Blackall an option to purchase the estate with the finished building thereon, and took a guaranty for the erection of the building. The testimony of his son and agent goes also to show his sanction to the proceeding. The case in this respect is stronger than *Case* v. *Minot*, 158 Mass. 577, and is sufficient to show not only that Carter gave authority, but that Blackall acted upon it.

3. The third ruling asked for became immaterial by the finding of facts which negatived the supposition upon which the request rested, and established that the building was removed in pursuance of authority from Carter.

No other questions are presented by the report.    The general finding for the plaintiff implies that in the opinion of the court the building might have been made safe and secure, and that it was not necessary to take it down.    No question was saved as to this.    *Judgment for the plaintiff on the findings.*